IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL SANUDO,

                    Petitioner,

        vs.

ERIC ARNOLD, Warden, California State
Prison, Solano,[1]

                 Respondent.

No. 2:14-cv-00068-JKS

MEMORANDUM DECISION

       Michael Sanudo, a state prisoner represented by counsel, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Sanudo is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at California State

Prison, Solano.  Respondent has answered, and Sanudo has replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

       On February 9, 2010, Sanudo was charged, along with co-defendant Aaron Richard

Ouellette, with first-degree special circumstance murder (Count 1), second-degree robbery

(Count 2), active participation in a criminal street gang (Count 3), and assault with a deadly

weapon (Count 4).  The information alleged as to Counts 1, 2, and 4 that the offenses were

committed for the benefit of and in association with a criminal street gang, and that the

defendants inflicted great bodily injury in the commission of Counts 2 and 4.  The information

further alleged that the defendants each served a prior prison term.  On direct appeal of his

---

[1]     Eric Arnold, Warden, California State Prison, Solano, is substituted for Fred
Foulk, former Warden, High Desert State Prison.  FED. R. CIV. P. 25(c).

conviction, the California Court of Appeal laid out the following facts underlying this case and

the evidence presented at trial:

> Six percipient witnesses testified consistently to all or part of the narrative the prosecution argued to the jury—that two inebriated gang members robbed a man on a bike in the middle of the night in a dark alley, kicked him in the head and ribs as he lay on the ground, jumped in their truck and rolled over him several times, moved forward then stopped and looked under the truck, accelerated down the street with the man stuck in the tire well, turned the corner, parked the truck, and took off running.  Following a joint trial, a jury convicted defendants Aaron Richard Ouellette and Michael Angelo Sanudo of first degree murder, robbery, active participation in a criminal street gang, and assault, and found true the special circumstance that the murder was committed during a robbery.

> Ouellette testified he did not rob the decedent, Willie Dean Roberts, Jr., did not intend to hurt him, and did not know that he had run over him or dragged him under the truck for approximately 730 feet.  Sanudo did not testify, but his lawyer argued he committed no crime; rather, he was unfortunately at the wrong place at the wrong time.  On appeal, both defendants attempt to retry their case, casting aspersions on the credibility of the percipient witnesses and insisting that the killing was an accident unrelated to any gang activity. They raise a host of meritless challenges to the jury instructions and the sufficiency of the evidence. We affirm.

### FACTS

> Two skilled defense lawyers subjected all six percipient witnesses to grueling cross-examination.  As a result, the jury was well acquainted with the weaknesses in their abilities to perceive and recall what they heard and saw in the wee morning hours of September 29, 2007.  Most notably, five of the six had been drinking, and most of them testified to facts they had not disclosed to the police officers at the scene of the crimes or shortly thereafter.  They were emotionally traumatized by the grisly death they witnessed and, for some, they had difficulty testifying about the events two and a half years later.  Viewing the evidence, however, in the light most favorable to the prosecution, as we must, the witnesses provide a chilling account of what defendants did and said to the victim.

> Riki Clark and Erica Hill were outside Clark's apartment under a carport smoking when Roberts rode by on his bicycle.  Shortly thereafter they saw three people in a fight.  Hill heard defendants ask Roberts, "What do you got for us, nigger?" and then demand, "Give us what you got for us, nigger."  She saw the driver, Ouellette, push Roberts off his bike.  Both Clark and Hill saw defendants kicking him; Ouellette kicked Roberts in the face six to seven times while Sanudo kicked him in the ribs.  Ouellette rifled through Roberts's pockets, and papers were "flying in the air" and onto the ground.  Ouellette stuffed some of the items into his own pockets and Sanudo kicked Roberts again.

> According to Hill, defendants then got into their truck and backed up over the victim, going forward and back about three times in the carport driveway.  Roberts

became lodged near the pickup's right front tire. Sanudo leaned out of the passenger window and looked toward the front of the truck. He then opened the front door, looked under the front right tire, and kicked Roberts in the head four times. Ouellette went forward and then in reverse a couple more times, but Roberts remained lodged under the pickup. Hill chased after the truck. But the driver stopped, got out, and lifted his shirt to expose what Hill thought was a gun near his belt buckle. She ran away. With Roberts still trapped, Ouellette got back into the truck and drove down the alley.

Three of the other witnesses were together at Latoya Perico's apartment. Naqueita Cox and Latoya Shaw were on the balcony overlooking the alley when they heard tires screeching. Cox reported that it sounded like teenagers "burning rubber." She testified that the truck stopped and either the driver or the passenger got out, looked at the body under the truck, and then got back into the truck. Shaw testified they both got out of the truck to look under it, and they got back in together. Perico testified that after hearing Cox shout that someone was trapped under the truck, she ran outside and saw two men get out of the truck, get back in, and drive away.

Christina Dearden was the sixth neighbor to testify. From her bedroom, she heard screeching tires. She looked out her window and saw a white driver and a Mexican passenger get out of a truck. At the preliminary hearing she testified that the passenger looked under the truck and ran away while the driver walked away, but at trial she testified it was the passenger who looked under the truck and walked away while the driver immediately ran away.

As mentioned above, defendants attempted to impeach all six witnesses by demonstrating inconsistencies in their testimony and their failure to disclose pertinent details on the night of the murders. All but Dearden had been drinking. Moreover, defendants insisted that the forensic evidence did not support the eyewitness accounts.

For example, the pathologist testified that Roberts's injuries were consistent with being trapped under the truck and dragged, and not with being run over multiple times as Hill had testified. Moreover, there was no blood or body tissue in the driveway area where defendants purportedly ran over the victim. Nor was there any blood on either of defendants' shoes or fingerprints on any of the contents of the victim's wallet.

The first police officer on the scene noticed a large pool of blood, a bicycle, and papers in the alley. He followed the trail of blood to a blue pickup truck parked approximately 730 feet away. He saw the bottom of Roberts's shoe sticking out from beneath the truck. Roberts remained pinned under the front tire. Other officers found Roberts's wallet in the alley with some of its contents strewn next to it.

A toxicologist testified that based on blood samples taken the next morning from defendants, Ouellette's blood alcohol level would have been about .19 percent and Sanudo's would have been about .15 percent at the time of the incident.

A gang expert testified that both defendants were active Norteño gang members on September 29, 2007. Both had admitted to being gang members on multiple occasions. They had gang tattoos, accompanied other gang members, and frequented gang areas. The expert explained the primary activities of the Norteño gang included battery, mayhem, assault with a deadly weapon, attempted murder, and murder. He testified to numerous predicate offenses, which are not challenged on appeal. When

3

given a hypothetical situation involving facts similar to what occurred in the alley on September 29, he opined that the crime was committed in association with the Norteño street gang, furthered the criminal conduct of the Norteño street gang, and benefited the Norteño street gang.

Ouellette testified in his own defense. He disputed the eyewitness testimony and asserted that all six witnesses were wrong. He did not initiate a fight with Roberts, he did not threaten him verbally, he did not kick or stomp him, he did not take anything from him, he did not intend to hurt him, and he did not know the man was stuck under the truck. Rather, he claimed it was Roberts who had started the fight after he asked Roberts for a cigarette. Ouellette merely tried to defend himself; indeed, he could not strike the victim because his arm was injured. He was intoxicated when he got into the truck, the radio was blasting, and when he had difficulty steering the truck on the wet pavement he believed he had a flat tire. He parked the truck in front of Sanudo's mother's apartment and ran because he was being pursued by people he did not know, and as an intoxicated parolee, he wanted to avoid arrest.

The prosecution introduced evidence of gang indicia Sanudo possessed in jail, including a picture of his son in a red jersey with the number 14 on it. The color red and the number 14, the gang expert instructed the jury, were commonly associated with the Norteños. Sanudo was also in possession of a letter that outlined the history of the Norteño gang.

Sanudo did not testify, but his son's godmother testified that she gave her godson the red shirt, and she had no familiarity with gangs or the symbolism associated with the color or number. His girlfriend testified that Sanudo had never claimed to be a Norteño.

The jurors deliberated for 13 hours over two days and asked for Hill's testimony to be reread. They found defendants guilty of murder and found the robbery special circumstance true, but acquitted on both the torture and gang special circumstance allegations. The jury found them guilty of robbery but found not true the allegations that the defendants inflicted great bodily injury during the robbery and committed the robbery to promote a gang. The jury found defendant Sanudo guilty but acquitted Ouellette of active participation in a criminal street gang. They were both acquitted of assault with a deadly weapon, but convicted of the lesser included offense of simple assault.

The court sentenced defendants to life in prison without the possibility of parole. All other terms of imprisonment were stayed.

*People v. Ouellette et al.*, No. C065374, 2012 WL 3244047, at *1-3 (Cal. Ct. App. Aug. 10, 2012).

Through counsel, Sanudo appealed his conviction, arguing that: 1) there was insufficient evidence that Sanudo intended to rob the victim such that the murder, robbery, and robbery special circumstance counts should be reversed; 2) Sanudo lacked the intent to kill the victim

such that the special circumstance allegation should be reversed; 3) the trial court erred in failing

to instruct the jury on assault as a lesser-included offense of robbery; 4) there was insufficient

evidence that Sanudo aided and abetted the robbery with the intent to promote gang activity;

5) the trial court erred with respect to CALCRIM No. 370, which reduced the prosecution's

burden of proving guilt beyond a reasonable doubt in Count 3 (active participation in a criminal

street gang); and 6) insufficient evidence supported the jury's finding that Sanudo was a major

participant in the robbery and acted with reckless indifference to human life with respect to the

special circumstance murder finding.  In a reasoned, unpublished opinion issued on August 10,

2012, the Court of Appeal affirmed the judgment against Sanudo in its entirety.  *Ouellette*, 2012

WL 3244047, at *12.[2]  Sanudo petitioned for review in the California Supreme Court, which was

denied without comment on November 14, 2012.

Again proceeding through counsel, Sanudo filed a petition for habeas relief in the

California Superior Court.  In that petition, Sanudo argued that trial counsel was ineffective for:

a) failing to focus on Sanudo's lack of intent to kill; b) failing to have Daisy Chavez testify

regarding a call Ouellette made to her after the incident; and c) not arguing at sentencing that

Sanudo's punishment should be reduced under *People v. Dillon*.[3]  On November 25, 2013, the

Superior Court denied the petition, concluding that Sanudo failed to establish a prima facie case

---

[2]     The Court of Appeal likewise affirmed the judgment against Ouellette.  *Ouellette*, 2012 WL 3244047, at *12.

[3]     *Poeple v. Dillon*, 668 P.2d 697 (Cal. 1983) (reducing a first-degree murder conviction to second-degree murder based on a proportionality analysis addressing the totality of the circumstances of the crime, including such factors as the defendant's age, prior criminality, personal characteristics, and state of mind).

for relief because he did not demonstrate that, but for counsel's alleged ineffectiveness, the result at trial would have been more favorable.

Sanudo timely filed a counseled Petition for a Writ of Habeas Corpus to this Court on January 10, 2014.  *See* 28 U.S.C. § 2244(d)(1)(A).  While the instant Petition was pending, counsel raised his ineffective assistance claims in a habeas petition in the California Court of Appeal.  Sanudo moved for a stay and abeyance in the instant case to allow him to pursue his claims in state court.  Docket No. 3.

A previously-assigned magistrate judge recommended that the stay be granted, Docket No. 16, but Sanudo's habeas petitions in the state appellate courts were denied without comment on January 9, 2014, and April 9, 2014, respectively.  Counsel then moved to life the stay and proceed on an Amended Petition.  Docket Nos. 17, 18.  The magistrate judge denied the motion to lift the stay as moot because the stay had not been entered, and ordered Respondent to respond to the Amended Petition.  Docket No. 20.  Briefing in this case is now complete, and the case is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Sanudo argues that: 1) there was insufficient evidence that he intended to rob the victim; 2) there was insufficient evidence to support the jury's finding that the murder was committed in the course of a robbery; 3) the trial court erred by failing to instruct the jury on the lesser-included offense of assault; 4) the evidence was insufficient to sustain his conviction for active participation in a criminal street gang; 5) the trial court erroneously instructed the jury on the crime of active participation in a criminal street gang; 6) trial counsel was ineffective in his closing argument because he failed to focus on

6

Sanudo's lack of intent to kill; 7) counsel was ineffective for failing to have Daisy Chavez testify as to Ouellette's phone call after the incident; and 8) counsel was ineffective for not arguing at sentencing that Sanudo's punishment should be reduced under *Dillon*.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

A.      Insufficiency of the Evidence (Grounds 1, 2, 4, 6)

Sanudo first argues that the evidence against him was insufficient to sustain a number of his convictions. As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis

8

in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted). It is through this lens that this Court must view insufficiency of the evidence claims.

1.      *Intent to rob the victim*

Sanudo contends that there was insufficient evidence that Sanudo intended to rob the

victim.  The Court of Appeal described and rejected this argument on direct appeal as follows:

> On appeal, Sanudo makes a very plausible closing argument to the jury that he
> could not have robbed Roberts because he did not know a robbery was occurring.  In his
> selective retelling of the evidence, he came upon the scene as the scuffle had already
> begun, and he interceded merely to help defend his friend.  He contends there is
> insufficient evidence his intent to steal was formed before or during the act of force, a
> necessary prerequisite to a robbery conviction.  (*People v. Marshall* (1997) 15 Cal.4th 1,
> 34.)
>
> The testimony of two eyewitnesses, Clark and Hill, is essential to our assessment
> of the sufficiency of the evidence.  But first we must dismiss two arguments Sanudo
> makes repeatedly and heatedly, accentuated as they are by capitalization and rhetorical
> questions.  He attacks the credibility of the witnesses.  Two competent defense attorneys
> subjected the witnesses to grueling cross-examination, and all of the weaknesses in their
> testimony were exposed to the jury at trial.  The jurors, and not the justices of the Court
> of Appeal, are the triers of fact charged with the responsibility to assess credibility.  On
> appeal, we must presume the jury found their testimony credible.
>
> Secondly, the prosecutor's argument is not evidence.  We reject Sanudo's
> emphatic insistence that we consider the prosecutor's argument in our evaluation of the
> sufficiency of the evidence.
>
> Instead, we must review Clark's and Hill's testimony in the light most favorable
> to the verdict.  Clark testified she saw two men bent over the man on the ground and at
> one point saw two men kicking the man.  She could see punches and arms "flailing."  She
> next saw the suspects rifling through the victim's pockets.  The jury heard, too, that Clark
> had been drinking, it was dark, and she could not be sure of what she had seen.
>
> Hill provided more details.  She testified she saw an African–American male on
> his bicycle and two gentlemen walking up to him.  She heard them call him a "nigger"
> and kept repeatedly asking, "What do you got for us?" and "Give us what you got for us,
> nigger."  She insisted she heard them both talking; she could hear two different voices.
> Then she described what she saw: "One of the gentlemen pushed him off the bike and as
> he hit the ground, the other gentleman started taking the bottom of the foot, his foot, and
> kicking his face into the curb.  And the other gentleman who pushed him off the bike
> started kicking him in the ribs and going through his back pockets and his front pockets
> and stuffing items into his own pockets."  She saw them both kicking him at different
> times.  But she clearly stated that Ouellette (the driver) was the one who went through the
> victim's pockets while Sanudo (the passenger) stood one and a half feet away.  Then
> Sanudo resumed kicking the victim as Ouellette "was stuffing things into his pocket."
>
> Again, Hill's testimony was not without its weaknesses.  She, too, had been
> drinking.  She, too, gave different versions at different times.  And her testimony

conflicted with Ouellette's account that Sanudo did not arrive on the scene until after the scuffle had begun.

Nevertheless, Hill and Clark both placed Sanudo at the scene of the robbery, playing an integral role in facilitating the taking of the victim's property by kicking him on the ground before and after his friend and fellow gang member rifled through the victim's pockets and stuffed the property into his own pockets. Sanudo insists there is no evidence he knew Ouellette would rob the man after they kicked him in the head and rib cage. But that is only one inference to be drawn from the testimony.

It was the jury's prerogative to believe Hill's account that both defendants called the victim a "nigger" and taunted him with the refrain, "What do you got for us." Even if Sanudo did not say the words, the jury may have inferred that he heard Ouellette as he approached. And these exclamations certainly evidenced an intent to rob. Moreover, the jury was well acquainted with the custom and practices of Norteños, who robbed, beat, shot, and killed with some regularity. Thus, it was hardly a stretch for the jury to infer that Sanudo would support a fellow gang member in perpetrating the robbery of a defenseless man who, after they kicked him mercilessly, lay bludgeoned in the alley. The inference was bolstered by Hill's testimony that Sanudo stood in close proximity to the victim as Ouellette went through his pockets and put the property in his own pocket, supporting the prosecution's theory that Sanudo aided and abetted the robbery.

Because "[a] reviewing court neither reweighs evidence nor reevaluates a witness's credibility" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27), we are not at liberty to find the evidence insufficient "simply because the circumstances might also reasonably be reconciled with a contrary finding" (*Albillar*, *supra*, 51 Cal.4th at p. 60). The evidence, if not overwhelming, is substantial. There is sufficient evidence to support the jury's finding that Sanudo intended to rob the victim either before or contemporaneously with the exertion of force and fear. Reversal is not warranted.

*Ouellette*, 2012 WL 3244047, at *11-12.

In support of his claim, Sanudo again points to inconsistencies and weaknesses in the testimony against him. But, like the Court of Appeal, this Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. *Schlup v. Delo*, 513 U.S 298, 330 (1995); *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004). Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup*, 513 U.S. at 330. Here, the testimony provided, as thoroughly recounted by the Court of Appeal, was more than sufficient to sustain Sanudo's conviction. Contrary to Sanudo's arguments, the fact that the jury's credibility

11

assessments were not in his favor does not amount to a constitutional violation.  Although it

might have been possible to draw a different inference from the evidence, this Court is required

to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Sanudo bears

the burden of establishing by clear and convincing evidence that these factual findings were

erroneous.  28 U.S.C. § 2254(e)(1).  He has failed to carry such burden.  As thoroughly and

persuasively explained by the Court of Appeal, the record does not compel the conclusion that

no rational trier of fact could have found proof that Sanudo had an intent to steal, especially

considering the double deference owed under *Jackson* and AEDPA.  Sanudo is therefore not

entitled to relief on this claim.

　　　　2.　　　*Murder was committed in course of robbery*

　　　　Sanudo similarly argues that there was insufficient evidence establishing that Sanudo, as

an aider and abettor, had the intent to kill or acted with reckless indifference to human life while

acting as a major participant in the robbery to sustain the special circumstance robbery

allegations.  The Court of Appeal rejected this claim on direct appeal as well:

> Contrary to Sanudo's arguments on appeal, the prosecution did not have to prove
> that he planned to rob and kill victim Roberts before the events of the early morning
> hours of September 29 unfolded.  It may be that the robbery and murder were crimes of
> opportunity and that neither Ouellette nor Sanudo premeditated the attack and robbery.
> The prosecution's burden to prove the special circumstance was far different.  "In order
> to support a finding of special circumstances murder, based on murder committed in the
> course of a robbery, against an aider and abettor who is not the actual killer, the
> prosecution must show that the aider and abettor had the intent to kill or acted with
> reckless indifference to human life while acting as a major participant in the underlying
> felony."  (*People v. Proby* (1998) 60 Cal. App. 4th 922, 927.)
> It is undisputed that Ouellette was the driver of the truck.  As a result, the jury
> convicted Sanudo of murder as an aider and abettor.  The question is whether there is
> substantial evidence that he was a major participant in aiding and abetting the
> murder-robbery and that he acted with reckless indifference to human life.  "[R]eckless
> indifference to human life" is a "subjective appreciation, or knowledge, by the
> defendant" (*Lewis v. Runnels* (E.D.Cal., Dec. 21, 2009, No. CIV S–03–1410 GEB EFB

P) 2009 U.S. Dist. LEXIS 118255 at p. *19, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 152, 157–158 [95 L.Ed.2d 127] ) "of the grave risk to human life created by his or her participation in the underlying felony" (*People v. Estrada* (1995) 11 Cal.4th 568, 578).

 It can hardly be said that Sanudo played a trivial role in the brutal attack on the cyclist.  He and Ouellette simultaneously and repeatedly kicked the man until he was unconscious and unable to defend himself.  Sanudo's representation that he kicked the victim once or twice seriously misrepresents the record.  His argument that a reasonable person would never suspect that a couple of kicks would lead to death is a hypothetical totally divorced from the reality of the evidence before us.  There is ample evidence, therefore, that he was a major participant.

 Moreover, the Attorney General does a remarkably thorough and lucid job of marshalling the evidence in support of the jury's finding that Sanudo subjectively appreciated the grave risk to Roberts's life by his own participation in the robbery and murder.  We extract the summary aptly provided by the Attorney General.  "Sanudo was aware that the pickup he was getting into had to reverse out of the parking space and into the alleyway.  Sanudo knew Roberts' body was in the alley not far from the pickup.  The jury could have reasonably found Sanudo became subjectively aware of a grave risk to human life once Roberts was kicked unconscious and left in the alleyway where Ouellette had to reverse his pickup into in order to leave the scene of the robbery.  [¶]  If not then, when Ouellette first ran over Roberts and Sanudo looked out the passenger window and saw Roberts under the pickup.  [Citation.]  If not then, when Sanudo opened the passenger door and kicked Roberts in an attempt to dislodge Roberts from the vehicle.  [Citation.]  If not then, when Sanudo got out of the pickup, looked under the pickup, and got back in the pickup before Ouellette accelerated down the alleyway."

 In *People v. Smith* (2005) 135 Cal.App.4th 914, the court held that the jury justifiably concluded a mere lookout acted with reckless indifference by simply failing to aid the victim or summon help.  (*Id*. at pp. 927–928.)  Sanudo's subjective awareness and personal participation far surpassed the lookout's passive failure to respond. Because Sanudo was aware the man was on the ground behind the truck, saw him lodged under the tire, and nevertheless did nothing to intercede on his behalf, the evidence is more than sufficient under Smith to uphold the jury's finding.  The precise moment of death does not determine Sanudo's state of mind.

*Ouellette*, 2012 WL 3244047, at *12-13.

Sanudo again futilely attacks the credibility of the witnesses against him.  And again,

viewing the evidence in the light most favorable to the prosecution, the Court of Appeal

concluded the evidence was sufficient to support Sanudo's conviction of special circumstance

murder.  This conclusion is both reasonable and fully supported by the record.  Habeas relief is therefore not warranted on this claim.

3.      *Active participation in a criminal street gang*

Finally, Sanudo alleges that his conviction for actively participating in a criminal street gang must be reversed because there was insufficient evidence that he had the intent to promote felonious conduct by a gang (Ground 4) and insufficient evidence that he had knowledge of the gang's primary activities (Ground 6).

"The elements of [the street terrorism] offense in [California Penal Code §] 186.22(a) are: First, active participation in a criminal street gang . . .; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang."  *People v. Rodriguez*, 290 P.3d 1143, 1146 (Cal. 2012).  The person's involvement with a criminal street gang must be more than nominal or passive.  *Id.*; *People v. Castaneda*, 3 P.3d 278, 23 Cal. 4th 743, 752 (Cal. 2000); *People v. Ngoun*, 105 Cal. Rptr. 2d 837, 839 (Cal. Ct. App. 2001) ( "Hence, under section 186.22, subdivision (a) the defendant must necessarily have the intent and object to actively participate in a criminal street gang.").  "[T]o satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct.  The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member."  *Rodriguez*, 290 P.3d at 1148 (italics in original). A person can willfully promote, further, or assist in any felonious criminal conduct by gang members if he or she is the "perpetrator of felonious gang-related criminal conduct [or the] aider

14

and abettor." *Ngoun*, 105 Cal. Rptr. 2d at 839; *see also People v. Johnson*, 176 Cal. Rptr. 3d

917, 920-21 (Cal. Ct. App. 2014).

In this case, as the Court of Appeal explained, Sanudo's claim that he lacked the intent to

promote felonious conduct by a gang is based on a misconception of California state law.  The

California Supreme Court has held that "[a]ll three elements [of the street terrorism offense] can

be satisfied without proof the felonious criminal conduct promoted, furthered or assisted was

gang related."  *People v. Albillar*, 244 P.3d 1062, 1072 (Cal. 2010).  The Court of Appeal in this

case explained:

> It appears from their verdicts that this perceptive jury deciphered the important,
> but subtle, distinction between the substantive offense of actively participating in a
> criminal street gang and a gang enhancement.  The crime of so-called "street terrorism"
> need not be gang related, whereas a gang enhancement requires a gang-related purpose.
> The jury convicted defendants of actively participating in a criminal street gang but
> acquitted them of all gang-related enhancements.  Ignoring the distinction between the
> two, defendants contend there is insufficient evidence to sustain the jury's verdict on the
> substantive offense.
> . . . .
> We agree with defendants that any connection between the robbery and murder of
> Roberts and the Norteños is thin indeed.  If we were reviewing the sufficiency of the
> evidence to support a gang enhancement, we might be compelled to reverse because of
> the absence of evidence that the commission of the offenses was gang related.  The jury,
> as pointed out above, however, was shrewd enough to distinguish between a gang
> enhancement and the substantive offense of actively participating in a criminal street
> gang.  Conspicuously missing from the elements of the substantive offense is evidence
> the offense is gang related.  "Contrary to what is required for an enhancement under
> section 186.22 [, subdivision] (b), section 186.22[, subdivision] (a) does not require that
> the crime be for the benefit of the gang.  Rather, it 'punishes active gang participation
> where the defendant promotes or assists in felonious conduct by the gang.  It is a
> substantive offense whose gravamen is the participation in the gang itself.' [Citation.]"
> (*People v. Martinez* (2008) 158 Cal. App. 4th 1324, 1334.)

*Ouellette*, 2012 WL 3244047, at *9-10.

To the extent Sanudo challenges the Supreme Court's holding in *Albillar* before this

Court, this Court is bound by the state court's determination.  *See Bradshaw v. Richey*, 546 U.S.

74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  Importantly, Sanudo cites to no Supreme Court authority challenging the California Supreme Court's holding, and the Court is unaware of any.  Sanudo thus fails to demonstrate that the state courts' rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), and federal habeas relief is not warranted on this claim.

Sanudo's claim that there was insufficient evidence to support the three elements of the crime of active participation in a criminal street gang similarly fails.  As the Court of Appeal reasonably determined:

First, the prosecution must prove defendants actively participated in a criminal street gang.  There was ample evidence both defendants were active participants in the Norteños, a criminal street gang.  They both had admitted membership, both had numerous gang-related tattoos, both had been arrested, both had committed crimes in the company of Norteño gang members, and both had been contacted with other Norteño gang members while wearing gang colors.

Second, the prosecution must prove defendants had knowledge that the gang's members engaged in a pattern of criminal gang activity.  There is substantial evidence to support the jury's finding defendants knew the Norteño gang's members engage in or have engaged in a pattern of criminal activity.  The gang expert testified to a number of predicate offenses committed by Norteños, including two that were committed by Ouellette and Sanudo themselves.  Many, if not all, of the predicate offenses occurred during their tenure in the gang.  Moreover, the gang expert also testified that defendants committed crimes with other gang members; they were often contacted in the presence of other Norteños; Ouellette had numerous gang member contacts in his telephone address book, and Sanudo possessed a letter that outlined the history, guidelines, and commandments of the Norteños.

And third, the prosecution must prove that defendants willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang, either by directly committing a felony or by aiding and abetting the commission of a felony.  This

is the key element that distinguishes the substantive offense from a gang enhancement. "The plain language of the statute thus targets felonious criminal conduct, not felonious gang-related conduct." (*Albillar*, *supra*, 51 Cal. 4th at p. 55.) And the Supreme Court was emphatic: "[T]here is nothing absurd in targeting the scourge of gang members committing any crimes together and not merely those that are gang related." (*Ibid.*)

   Thus, defendants' arguments on appeal completely miss the mark. There is substantial evidence that Ouellette, a Norteño, engaged in a fight with Roberts and that Sanudo, another Norteño, assisted him. The jury found them both guilty of robbery and murder, either as a direct perpetrator or as an aider and abettor. There was testimony at trial that they both kicked Roberts as he lay in the street, and either one or both of them rummaged through his pockets. This evidence is sufficient to support the jury finding that Ouellette and Sanudo, gang members, acted with the specific intent to promote, further, or assist each other in that criminal conduct. The challenge to the sufficiency of the evidence fails.

*Ouellette*, 2012 WL 3244047, at *9-11.

   In this case, much of the evidence that Sanudo had knowledge that the gang's members engaged in a pattern of criminal gang activity was provided by a gang expert. This testimony falls within the recognized scope of permissible expert testimony as to gang culture, habits, and motivation. *In re Frank S.*, 46 Cal. Rptr. 3d 839, 842 (Cal. Ct. App. 2006) ("It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation."). Moreover, as the Court of Appeal explained, the third element simply required evidence that Sanudo aided and abetted by willfully assisting, furthering, or promoting felonious criminal conduct by another member of the gang. *Ouellette*, 2012 WL 3244047, at *11. The record amply supports the Court of Appeal's conclusion that Sanudo acted with the intent of promoting, furthering, or assisting Ouellette's criminal conduct. Sanudo is therefore not entitled to relief on this claim.

B.  <u>Instructional Error (Grounds 3, 5)</u>

   Sanudo next claims that the trial court made two instructional errors that warrant reversal of his conviction. Because jury instructions in state trial are typically matters of state law,

federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw*, 546 U.S. at 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

18

that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson*, 431 U.S. at 155. In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

      1.     *Assault as lesser-included offense of robbery*

Sanudo contends that the trial court erred by failing to instruct the jury that assault was a lesser included offense to robbery. The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases. The Ninth Circuit, like several other federal circuits, has declined to extend *Beck* to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital

19

case does not present a federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."). Accordingly, the decisions of the California courts denying Sanudo relief as to this claim are not contrary to United States Supreme Court authority as set forth in *Beck*.

Nevertheless, the Ninth Circuit has stated that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme Court precedent. *Solis*, 219 F.3d at 929. But Sanudo has not established any basis for the giving of the instruction. His argument that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), required the trial court to treat the great bodily injury enhancement as an element of the crime of robbery is without merit. In *Apprendi*, the U.S. Supreme Court considered whether the Due Process Clause "requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." *Id.* at 468. The Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the proscribed maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. *Apprendi* did not address whether a sentence enhancement should be considered an element of an offense in determining whether, under state law, a lesser offense is necessarily a lesser included offense.

Sanudo cites no federal authority for such a proposition. Indeed, no Supreme Court case adopts the *Apprendi* line of reasoning with respect to the specific elements of proof necessary for a murder conviction. Instead, the California legislature's decision on how to define the elements

of a crime is usually dispositive.  *See, e.g.*, *Patterson v. New York*, 432 U.S. 197, 206-08 (1977).

As noted by the Court of Appeal, *Ouellette*, 2012 WL 3244047, at *3-5, the California Supreme

Court has repeatedly stated that sentencing enhancements should not be considered elements of

the offense, *see People v. Anderson*, 211 P.3d 584 (Cal. 2009); *People v. Sloan*, 164 P.3d 568

(Cal. 2007); *People v. Wolcott*, 665 P.2d 250 (Cal. 1983).  In *Sloan* and *Anderson*, the California

Supreme Court explicitly rejected the argument that *Apprendi* requires that sentencing

enhancements be treated as elements of the offense.  The California Court of Appeal's denial of

Sanudo's claim that *Apprendi* requires trial courts to treat enhancements as elements of the

offense for purposes of determining lesser included offenses was not an unreasonable application

of clearly-established Supreme Court authority, and Sanudo's claim must also fail here.

　　　2.　　*Instruction on active participation in a criminal street gang*

　　　Sanudo additionally argues that the trial court erroneously instructed the jury on the

crime of active participation in a criminal street gang.  The Court of Appeal considered and

rejected this claim as follows:

> Defendants next assert that CALCRIM No. 1400 allowed the jury to convict them
> of active participation in a criminal street gang on a theory that has no basis in state law.
> It takes some patience to unravel the meaning of their argument, but once understood it
> can be easily and summarily rejected.
> 　　The court instructed the jury in the language of CALCRIM No. 1400 as follows:
>
> "To prove that the defendant is guilty of this crime, the People must prove that:
> 　　"1. The defendant actively participated in a criminal street gang;
> 　　"2. When the defendant participated in the gang, he knew that members of
> 　　the gang engage in or have engaged in a pattern of criminal gang activity;
> "AND
> 　　3. The defendant willfully assisted, furthered, or promoted felonious
> 　　criminal conduct by members of the gang either by:
> 　　　　"a. directly and actively committing a felony offense;
> 　　"OR
> 　　　　"b. aiding and abetting a felony offense."

As relevant here, CALCRIM No. 1400 explains the meaning of "a pattern of criminal gang activity" as described in subparagraph 2 and "felonious criminal conduct" as described in subparagraph 3. Defendants would have us assume the jurors jumbled the meaning of the two subparagraphs, confused the two, and created their own crime. We have no doubt that a reasonable juror would not construe the instruction as defendants suggest to reach the result they contend requires reversal.

To establish "a pattern of criminal gang activity," the jurors were told they could use the following convictions: "vehicle theft, extortion, possession of a concealed firearm in a vehicle, felony vandalism, assault with a deadly weapon or by means of force likely to cause serious bodily injury, or battery with serious bodily injury, or commission of murder, robbery, or assault with a deadly weapon or by means of force likely to cause serious bodily injury." But the crimes needed to establish the "felonious criminal conduct" described in subparagraph 3 were quite different. Indeed, CALCRIM No. 1400 stated: "Felonious criminal conduct means committing or attempting to commit any of the following crimes: murder, robbery, assault with a deadly weapon or by means of force likely to cause serious bodily injury. [¶] To decide whether a member of the gang or the defendant committed murder, robbery, or assault with a deadly weapon or by means of force likely to cause serious bodily injury, please refer to the separate instructions that I have given you on those crimes."

Defendants argue that the jurors may have used one of their predicate offenses, that is, crimes that established a pattern of criminal gang activity in subparagraph 2, to prove the felonious criminal conduct described in subparagraph 3. Thus, they surmise that the jurors found they either directly and actively committed "a felony offense" or aided and abetted "a felony offense" not by finding they committed murder, robbery, or assault with a deadly weapon, but by relying on their aged predicate offense convictions of concealing a firearm in a vehicle on March 22, 2006 (Ouellette) and vehicle theft on January 31, 2005 (Sanudo).

We conclude that a reasonable juror would not engage in such mental gymnastics. First, as the Attorney General aptly points out, CALCRIM No. 1400 specifically instructed the jurors that in order to find "'the defendant[s] willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by' directly and actively committing a felony or by aiding and abetting a felony, the jury was only to consider the crimes of murder, robbery, and assault with a deadly weapon or by means of force likely to cause serious bodily injury." Those were precisely the crimes simultaneously prosecuted against defendants. Second, the prior convictions for concealing a weapon and vehicle theft, the so-called predicate offenses, were not crimes that could be considered by the jury to establish felonious criminal conduct. As a result, we conclude reasonable jurors, applying the law as embodied in CALCRIM No. 1400, would not have convicted defendants based on the commission of the predicate offenses, but understood that the crime consisted of directly committing or aiding and abetting the much more serious crimes of murder, robbery, and assault. There was no instructional error.

*Ouellette*, 2012 WL 3244047, at *6-7.

The California Court of Appeal's conclusion is both reasonable and fully supported by the record.  Again, Sanudo cites no federal law disapproving of the use of such instruction under these circumstances.  Even if he could show state law error, which does not appear from the record, again, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the state evidentiary rules.")); *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court.").  Likewise, this Court is bound by the state appellate court's determination that the trial court was not required under California law to give a different instruction, in the absence of any due process violation.  Sanudo fails to establish a due process violation here because he may not transform his state instructional error claim into a federal claim by simply asserting a violation of his constitutional rights.  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation omitted).  Thus, Sanudo is not entitled to relief on this instructional error claim either.

C.      Ineffective Assistance of Counsel (Grounds 7, 8, 9)

Finally, Sanudo alleges that his trial counsel rendered ineffective assistance in a number of ways.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient

performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one

in which "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the

outcome might have been different as a result of a legal error, the defendant has established

prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v.*

*United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas

petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice

standard is applied and federal courts do not engage in a separate analysis applying the *Brecht*

harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin*

*v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective

assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold."  And, because the
> *Strickland* standard is a general standard, a state court has even more latitude to
> reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Sanudo must show that defense counsel's representation was not within the range

of competence demanded of attorneys in criminal cases, and there is a reasonable probability

that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,*

474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the

petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See*

*Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

    1.    *Closing argument*

Sanudo first contends that counsel was ineffective for failing to argue during summation that Sanudo lacked an intent to kill and that he took no action that involved a grave risk of death to the victim.  A review of the record, however, reveals that counsel made a tactical decision not to argue lack of intent based on the prosecution's theory of the case and, contrary to Sanudo's assertion, argued that Sanudo took no action that involved a grave risk of death to the victim.

The record indicates that the prosecution explained that Sanudo could be guilty of first-degree murder under either a felony murder theory or under a theory of torture murder.  With respect to felony murder, the prosecutor explained that Sanudo must have had an intent to commit robbery but did not need to have the intent to kill.  With respect to torture murder, the prosecutor similarly explained that there was no need for Sanudo to intend to kill the victim; he must only have intended to aid and abet Ouellette in torturing the victim.  The prosecutor did not allege with respect to either theory that Sanudo had the intent to kill the victim, nor did he argue that the facts demonstrated Sanudo's intent to kill.  A tactical decision exercised by counsel deserves deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  In light of the prosecution's argument, counsel made a reasonable tactical decision not to argue intent to kill because the prosecutor had not put intent to kill at issue.  For the same reason, Sanudo cannot show that he was prejudiced by

counsel's omission; such argument would not have led to a more favorable outcome because the issue of intent to kill was irrelevant.

Moreover, the record reflects that counsel argued that Sanudo took no action that involved a grave risk of death to the victim.  In summation, counsel argued that evidence that showed Sanudo's involvement was lacking.  Counsel argued that the evidence did not support a finding that Sanudo kicked the victim because there was no blood found on Sanudo's shoes, the shoes were not tested for DNA, witnesses did not initially report seeing Sanudo kicking the victim and thus later statements to the contrary could not be believed, and there was no blood on the driveway.  Counsel likewise argued that there was no evidence that Sanudo was involved in the robbery because there was no evidence anything was taken from the victim and the evidence showed that Sanudo "stood there and did nothing."  The totality of defense counsel's argument, in context, reveals that counsel argued that Sanudo was not involved in the robbery and killing and thus took no action that involved a grave risk of death.  Accordingly, Sanudo cannot show that defense counsel's summation evinced deficient performance.

2.      *Testimony of Daisy Chavez*

Sanudo next claims that defense counsel was ineffective because he failed to have witness Daisy Chavez testify regarding a call Ouellette made to her after the incident.  According to Sanudo, Chavez would testify that Ouellette told her that everything was his fault and that Sanudo was not involved.  Sanudo recognizes that the testimony involves hearsay, but he argues that it would have nonetheless been admissible as a prior consistent statement or excited utterance.  Sanudo thus contends that the admission would have bolstered Ouellette's credibility.

Sanudo, however, fails to show that the hearsay testimony was admissible.  For Ouellette's statement to be admissible as an excited utterance, it must be considered reliable; that is, offered "without the opportunity to reflect on the consequences of one's exclamation."  *White v. Illinois*, 502 U.S. 346, 356 (1992).  Sanudo does not show the absence of an opportunity for Ouellette to have paused or reflected, and thus the possibility that Ouellette's statement was fabricated cannot be eliminated, thus rendering it inadmissible.  And although Sanudo argues that the statement was also admissible as a prior consistent statement, such argument is meritless as the record shows that Ouellette vigorously denied responsibility.

Moreover, even assuming that the testimony would have been admissible, Sanudo cannot show that he was prejudiced by its omission.  In light of the overwhelming evidence showing Sanudo's involvement (as discussed with regard to the sufficiency of the evidence claims above),

Sanudo cannot show that Chavez's testimony would have altered the outcome of the trial.[4]

Consequently, Sanudo fails to show that trial counsel was deficient in this regard.

3. *Applicability of Dillon*

Finally, Sanudo alleges that counsel's failure to raise at sentencing a cruel and unusual

punishment claim under *Dillon* constituted ineffective assistance of counsel.  However, Sanudo

fails to show that such a claim would have been meritorious.  Appellate counsel raised a cruel

and unusual punishment claim on collateral review, which was incorporated and rejected on

direct appeal:

> Sanudo continues to twist the facts to fit his storyline "that he had no intent to rob the victim and no idea what was going on."  He was, in his words, "just helping his friend out of the scuffle."  As we have pointed out in responding to the last two arguments, the jury rejected Sanudo's version of what happened.  Whether a sentence is disproportionate is measured against the jury's findings of guilt, not a defendant's revisionist remake.
>
> Given, as we have recounted above, that Sanudo aided and abetted a robbery and murder by kicking the victim, leaving him lying in the alley, jumping into a truck and watching the driver back over the body, looking under the truck and kicking the victim some more, jumping out of the truck and seeing the victim lodged under the tire, and then fleeing the scene, we conclude the sentence is neither cruel nor unusual and does not offend our constitutional sensibilities.

*Ouellette*, 2012 WL 3244047, at *13.

---

[4]    Other courts have admonished that harmless error review, which is similar to a prejudice determination, should not be confused with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. Sept. 8, 2015) ("Time and time again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict.").  The Court's reliance on the overwhelming evidence against Sanudo in finding no prejudice does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors," including the overall strength of the prosecution's case.  *Id.* at 904 (citations omitted).

As an initial matter, in *Strickland*, the Supreme Court expressly declined to consider the role of counsel in a noncapital sentencing proceeding, stating: "We need not consider the role of counsel in an ordinary sentencing, which may involve informal proceedings and standardless discretion in the sentencer, and hence may require a different approach to the definition of constitutionally effective assistance." *Strickland*, 466 U.S. at 686.  The Ninth Circuit has subsequently concluded that the Supreme Court "has not delineated a standard which should apply to ineffective assistance of counsel claims in noncapital sentencing cases[,][and][t]herefore, [. . .] there is no clearly established federal law as determined by the Supreme Court in this context." *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006) (citing *Cooper–Smith v. Palmateer*, 397 F.3d 1236, 1244 (9th Cir. 2005)).  Respondent urges that this Court is thus barred from considering Sanudo's claim.

Despite the Ninth Circuit's holdings, however, it appears that the Supreme Court has applied the *Strickland* standard to noncapital sentencing proceedings.  For example, in *Lafler v. Cooper*, the Supreme Court stated that its "precedents . . . establish that there exists a right to counsel during sentencing in both noncapital, and capital cases."  555 U.S. 156, 132 S. Ct. 1376, 1385-86 (2012).  Likewise, the Supreme Court has applied *Strickland* where a petitioner alleged that, due to trial counsel's error in a noncapital sentencing proceeding, his sentence was increased anywhere between 6 and 21 months.  *See Glover v. United States*, 531 U.S. 198, 200 (2001).  The Ninth Circuit has concluded that courts within this Circuit are nonetheless bound by the holdings of *Davis* and *Cooper-Smith* that it is not clearly established that *Strickland* applies to noncapital sentencing.  *See Daire v. Lattimore*, 780 F.3d 1215, 1221-22 (9th Cir. 2015).  This Court is therefore similarly bound.

In an abundance of caution, however, this Court will also consider the merits of Sanudo's claim.  To determine whether counsel should have argued at sentencing that Sanudo's punishment was cruel and unusual, the Court must consider such claim here.  The Eighth Amendment, applicable to the States through the Fourteenth Amendment, proscribes the infliction of "cruel and unusual punishments."  U.S. CONST. amend. VIII; *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).  In determining whether to infer gross disproportionality, a federal court should examine whether a petitioner's sentence is justified by the gravity of his triggering offense and his criminal history, a process similar to the three-pronged approach employed by California state courts.  *See Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004).  Where the crime is murder, even a life sentence without parole is not grossly disproportionate.  *See Harris v. Wright*, 93 F.3d 581, 584 (9th Cir. 1996) (life imprisonment without possibility of parole for aggravated first-degree murder raises no inference of gross disproportionality); *United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991) ("Under *Harmelin* [*v. Michigan*, 501 U.S. 957 (1991)], it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment.").  Furthermore, while the contours of the "gross disproportionality principle" have been called "unclear," the principle is applicable only in the "exceedingly rare" and "extreme" case.  *Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003); *see also Rummel v. Estelle*, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.").

Sanudo cannot demonstrate that his is one of the exceedingly rare cases in which the sentence imposed raises an inference of gross disproportionality when compared to the crime committed.  *See, e.g.*, *Ewing v. California*, 538 U.S. 11, 29-30 (2003) (sentence of 25 years to

life for grand theft of $1,200 of golf clubs was not cruel and unusual); *Lockyer*, 538 U.S. at 77

(two consecutive sentences of 25 years to life for petty theft was not cruel and unusual).  The

California Supreme Court's affirmance of his sentence was therefore not "contrary to, or . . . an

unreasonable application of," the gross disproportionality principle, the contours of which are

unclear.  *Lockyer*, 538 U.S. at 72-73.  Nor can Sanudo show that the result would have been

different had counsel raised his meritless cruel and unusual punishment claim at sentencing.

Sanudo is therefore not entitled to relief on this claim in any event.

V. CONCLUSION AND ORDER

Sanudo is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: March 2, 2017.

    /s/James K. Singleton, Jr.        <br>    JAMES K. SINGLETON, JR.<br>    Senior United States District Judge